# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION
### No. 5:21-CV-44-D

CUMIS INSURANCE SOCIETY, INC., )
)
                Plaintiff, )
)
          v. )         **ORDER**
)
NATIONWIDE MUTUAL FIRE )
INSURANCE COMPANY, )
)
             Defendant. )

On December 15, 2020, CUMIS Insurance Society, Inc. ("CUMIS" or "plaintiff") filed a complaint in Wake County Superior Court against Nationwide Mutual Fire Insurance Company ("Nationwide" or "defendant") [D.E. 1-1]. On January 28, 2021, Nationwide removed the action to this court [D.E. 1]. On October 26, 2022, CUMIS moved for partial summary judgment [D.E. 33] and filed a memorandum [D.E. 34], statement of material facts [D.E. 35], and appendix [D.E. 36] in support. On November 16, 2022, Nationwide responded in opposition [D.E. 45] and filed a memorandum [D.E. 46] in support. On December 2, 2022, CUMIS replied [D.E. 52].

On October 26, 2022, Nationwide moved for summary judgment [D.E. 39] and filed a memorandum [D.E. 40], statement of material facts [D.E. 41], and appendix [D.E. 42] in support. On November 16, 2022, CUMIS responded in opposition [D.E. 45]. On December 2, 2022, Nationwide replied [D.E. 55]. As explained below, the court grants in part and denies in part Nationwide's motion for summary judgment and denies CUMIS's motion for partial summary judgment.

## I.

On March 16, 2017, a fire damaged the Quorum Center Building ("Quorum Center") in Raleigh, North Carolina. This case centers on insurance coverage in the aftermath of the fire. The

Quorum Center is a mixed-use building with 14 floors. Floors 1 through 6 contain commercial units, and floors 7 through 15 contain residential units. See Nationwide Statement of Material Facts ("NSMF") [D.E. 41] ¶¶ 1, 3; CUMIS Response ("CR") [D.E. 48] ¶¶ 1, 3.

On December 21, 2006, pursuant to the North Carolina Condominium Act, the owner of the Quorum Center filed a "Declaration of Condominium for Quorum Center Condominium" ("Declaration") with the Wake County Registrar of Deeds. NSMF ¶¶ 30–31; CR ¶¶ 30–31. The Declaration provides, in relevant part:

### ARTICLE XI
### INSURANCE

Section 11.1 Property Insurance. The Association shall obtain and maintain at all times a policy of property insurance on the Building (ISO special form or its equivalent) in an amount not less than one hundred percent (100%) of the replacement cost of the Building and all contents thereof (except as expressly provided herein) at the time such insurance is purchased and at the time of each renewal thereof (excluding the cost of foundations and footings, and the cost of any personal property supplied or installed by Owners), with a commercially reasonable deductible not in excess of $10,000.00. . . . The policy shall contain . . . a special condominium endorsement providing as follows: . . . if, at the time of a loss under the policy, there is other insurance in the name of an Owner covering the same risk covered by the policy, the Association's policy provides primary insurance.

. . .

Section 11.7 Insurance Obtained by Owners. Each Owner shall obtain and keep continuously in force additional fire and casualty and extended coverage insurance upon his personal property, public liability insurance, and such other insurance as he may desire. Each Owner of a Commercial Unit shall obtain and maintain commercial general liability insurance combined single limit coverage in the amount of at least $1,000,000.00. Each Owner of a Residential Unit shall obtain and maintain liability insurance combined single limit coverage in the amount of at least $300,000.00. Each Owner shall file a copy of each such individual policy with the Association within thirty (30) days after purchase.

[D.E. 42-5] 24–27. On September 15, 2006, pursuant to this Declaration, Nationwide issued a policy of insurance to "first Named Insured, Quorum Center Condominium Master Owners Association Inc., for the Quorum Center" ("Nationwide policy"). See NSMF ¶ 36; CR ¶ 36.

The Local Government Federal Credit Union ("LGFCU") owns commercial units in the Quorum Center. See NSMF ¶ 4; CR ¶ 4. When LGFCU purchased the commercial units, it bought

2

floors 1, 4, 5, and 6 as "complete commercial units" and floors 2, 3, and 6 as incomplete "shells." NSMF ¶ 5; see CR ¶ 5. Around March 29, 2008, February 9, 2010, and June 1, 2012, LGFCU hired Modern South Construction Company, LLC to "upfit" floors 2, 3, and 6 to include installing doors, walls, ceilings, electrical systems, and other things. See NSMF ¶¶ 6–11; CR ¶¶ 6–11.

Nationwide included LGFCU on the "Schedule of Named Insureds" on the Nationwide policy. See NSMF ¶ 40; CR ¶ 40. Under the policy, Nationwide set the policy limits, and LGFCU did not request an increase in policy coverage for the Nationwide policy after LGFCU upfitted floors 2, 3, and 6. See NSMF ¶ 38; CR ¶ 38. The Nationwide policy generally provided coverage for building and personal property, business income, and extra expense. See NSMF ¶¶ 41–43; CR ¶¶ 41–43. Relevant to the dispute in this case, the Nationwide policy outlined what property the policy covered and what property the policy did not cover:

### A. COVERAGES

We will pay for direct physical loss of or damage to Covered Property at the described premises in the Declarations caused by or resulting from any Covered Cause of Loss.

### 1. COVERED PROPERTY

Covered Property includes Buildings as described under paragraph a. below, Business Personal Property as described under paragraph b. below, or both, depending on whether a Limit of Insurance is shown in the Declarations for that type of property. Regardless of whether coverage is shown in the Declarations for Buildings, Business Personal Property, or both, there is no coverage for property described under paragraph 2, PROPERTY NOT COVERED.

a. Buildings, meaning the described buildings and structures at the described premises, including:

. . .

(6) Any of the following types of property contained within a unit, regardless of ownership, if your Condominium Association Agreement requires you to insure it:

(a) Fixtures, improvements and alterations that are a part of the building or structure . . .

3

. . .

## 2. PROPERTY NOT COVERED

Covered Property does not include:

. . .

h.     Property that is covered under another coverage form of this or any other policy issued to the Named Insured listed on this policy in which it is more specifically described, except for the excess of the amount due (whether you can collect it or not) from that other insurance.

[D.E. 42-1] 22–23, 106. Under the endorsement defining condominium association coverage, the Nationwide policy explains that a "unit-owner may have other insurance covering the same property as this insurance. This insurance is intended to be primary, and not to contribute with such other insurance." Id. at 107.

LGFCU also separately purchased a CUMIS Credit Union Package of Protection ("CUMIS policy") to provide insurance coverage for its commercial units. See NSMF ¶¶ 12–13; CR ¶¶ 12–13.[1] On March 16, 2017, the policy limits on the CUMIS policy were Business Personal Property ($1,927,903 policy limit), Rental Income ($477,884 policy limit), Extra Expense ($2,000,000 policy limit), Data Processing Equipment ($2,000,000), and Data Processing Extra Expense ($1,000,000 policy limit). See NSMF ¶ 22, CR ¶ 22. The CUMIS policy covered, in relevant part:

### Business Personal Property

This Policy covers business personal property you own or lease for which you are legally liable. The property must be located in the building described on the Declarations with a Limit Of Insurance shown or in the open (or in a vehicle) within 2000 feet of the described premises or within 2000 feet of the building the business personal property is located in, whichever distance is greater. Covered Property consists of the following:

. . .

---

[1] Although the parties agree that LGFCU purchased a CUMIS policy, Nationwide claims the coverage of the commercial units began in 2017 while CUMIS claims the coverage began in 2007. Compare NSMF ¶ 13 with CR ¶ 13.

4

8.      Your interest as a condominium unit owner in fixtures, improvements, and alterations making up part of the building and owned by the insured as a condominium unit owner.

. . .

**Data Processing Equipment**

This Policy covers the following equipment located within the premises described on the Declarations or in the open (or in a vehicle) within 2000 feet of the described premises or within 2000 feet of the building, whichever distance is greater. This equipment may be either property you own or property belonging to others, which is in your care and for which you are or may be liable.

. . .

2.      The air conditioning system that is used solely to service your "data processing equipment";

3.      The electrical system that is used solely to service your data processing operations, provided such damage occurs within the building that houses your data processing operation or within 2000 feet of such building;

. . .

**Data Processing Extra Expense**

If Data Processing Extra Expense Optional Coverage at the premises described on the Declarations and for which a Data Processing Extra Expense Limit Of Insurance is shown on the Declarations, this Policy covers the actual and necessary "extra expense" you incur to continue your business activities after a "loss to your data processing operations."

. . .

**Extra Expense[2]**

1. We will pay the actual and necessary "extra expense" you incur to avoid or minimize the suspension of business and to continue your business activities. Coverage applies when you sustain a direct physical loss or damage to property at the premises described on the Declarations and for which an Extra Expense Coverage Limit Of Insurance is shown on the Declarations, caused by or resulting from any Covered Cause Of Loss.

. . .

---

[2] The CUMIS policy defines "extra expense" as:

necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property. This expense could include rental of temporary equipment or facilities and the cost of additional labor. "Extra expense" does not include the cost to repair or replace any property, or any loss to "valuable information."

[D.E. 42-2] 41.

5

**[Loss of Rental Income Coverage]**[3]

We will pay for the loss of "rental income" caused by a Covered Cause Of Loss, during the term of this Policy, at the premises described on the Declarations.

We will be liable under this Coverage for:

a. The actual loss of "rental income" sustained by you resulting directly from necessary untenantability.

[D.E. 42-2] 77, 103–04; [42-3] 16, 20; See NSMF ¶¶ 23–29; CR ¶¶ 23–29.

On March 16, 2017, a fire started at an apartment complex across the street from the Quorum Center. See NSMF ¶ 47; CR ¶ 47. The fire and efforts to extinguish the fire caused the Quorum Center to sustain significant damage, including damage to LGFCU's property. See NSMF ¶ 48; CR ¶ 48. On March 17, 2017, LGFCU provided notice to CUMIS of the losses from the fire. See NSMF ¶ 49; CR ¶ 49. On July 24, 2017, a claims manager from CUMIS notified counsel for Nationwide that Nationwide was responsible for coverage under the Nationwide Policy for losses that LGFCU sustained to fixtures, improvements, and alterations in its commercial units, but did not mention claims for extra expense and business income coverage. See NSMF ¶¶ 50–51; CR ¶¶ 50–51; [D.E. 42-10]. On August 30, 2017, an LGFCU officer sent Nationwide a letter making the same claims as CUMIS's July 24, 2017 letter. See NSMF ¶¶ 52–53; CR ¶¶ 52–53; [D.E. 42-

---

[3] The CUMIS Policy defines "rental income" as the sum of:

a. The total gross income you expect to receive from your tenant of the described premises as furnished and equipped by you; and

b. The amount of continuing charges you incur which otherwise were the legal obligation of and would be paid by your tenant.

[D.E. 42-2] 51.

11].[4] Neither CUMIS nor LGFCU made claims for Nationwide to pay LGFCU's losses under the extra expense and business income coverages. See NSMF ¶¶ 54–55; CR ¶¶ 54–55.

CUMIS seeks reimbursement from Nationwide for $2,165,070.58. See NSMF ¶ 56; CR ¶ 56. CUMIS paid LGFCU $1,527,264.52 under coverages for business personal property and data processing equipment for losses to fixtures, improvements, and alterations made by LGFCU to its commercial properties, $545,955.96 under coverage for data processing extra expense, extra expense, and loss of rental income, and $91,850.00 for "Pro Con Consulting" under coverage for extra expense coverage. See NSMF ¶¶ 57–59; CR ¶¶ 57–59.

## II.

Summary judgment is appropriate when, after reviewing the record as a whole, the court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); Scott v. Harris, 550 U.S. 372, 378, 380 (2007); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment must initially demonstrate the absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, see Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. See Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party.

---

[4] CUMIS admits that it did not communicate claims for extra expenses and business income coverage in its August 30, 2017 letter, but CUMIS notes that it included LGFCU's business income and extra expense in an August 24, 2020 letter CUMIS sent to Nationwide. See CR ¶ 53.

7

See Harris, 550 U.S. at 378. "When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." Desmond v. PNGI Charles Town Gaming, L.L.C., 630 F.3d 351, 354 (4th Cir. 2011).

A genuine issue of material fact exists if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. See Anderson, 477 U.S. at 249. "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position [is] insufficient . . . ." Id. at 252; see Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party, however, cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."). Only factual disputes that affect the outcome under substantive law properly preclude summary judgment. See Anderson, 477 U.S. at 248.

Because this dispute requires interpreting a North Carolina insurance contract, the court applies North Carolina substantive law. Accordingly, this court must predict how the Supreme Court of North Carolina would rule on any disputed state-law issues. See Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C., 433 F.3d 365, 369 (4th Cir. 2005). In doing so, the court must look first to opinions of the Supreme Court of North Carolina. See id.; Parkway 1046, LLC v. U.S. Home Corp., 961 F.3d 301, 306 (4th Cir. 2020); Stahle v. CTS Corp., 817 F.3d 96, 100 (4th Cir. 2016). If there are no governing opinions from that court, this court may consider the opinions of the North Carolina Court of Appeals, treatises, and "the practices of other states." Twin City Fire Ins. Co., 433 F.3d at 369 (quotation omitted). In predicting how the highest court of a state would address an issue, this court must "follow the decision of an intermediate state appellate court unless there is persuasive data that the highest court would decide differently." Town of Nags Head v. Toloczko, 728 F.3d 391, 398 (4th Cir. 2013) (quotation omitted); see Hicks v. Feiock, 485 U.S. 624, 629–30 & n.3 (1988). Moreover, in predicting how the highest court of a state would address an issue, this court "should not create or expand a [s]tate's public policy." Time Warner Ent.

8

-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp., 506 F.3d 304, 314 (4th Cir. 2007) (alteration and quotation omitted); see Day & Zimmermann, Inc. v. Challoner, 423 U.S. 3, 4 (1975) (per curiam); Wade v. Danek Med., Inc., 182 F.3d 281, 286 (4th Cir. 1999).

"The interpretation of language used in an insurance policy is a question of law, governed by well-established rules of construction." Trophy Tracks, Inc. v. Mass. Bay Ins. Co., 195 N.C. App. 734, 739, 673 S.E.2d 787, 790 (2009) (quotation omitted); see Wachovia Bank & Tr. Co. v. Westchester Fire Ins. Co., 276 N.C. 348, 354, 172 S.E.2d 518, 522 (1970); N.C. Farm Bureau Mut. Ins. Co. v. Mizell, 138 N.C. App. 530, 532, 530 S.E.2d 93, 95 (2000). "[T]he intention of the parties as gathered from the language used in the policy is the polar star that must guide the courts in the interpretation of such instruments." McDowell Motor Co. v. N.Y. Underwriters Ins. Co., 233 N.C. 251, 253, 63 S.E.2d 538, 540 (1951). When interpreting an insurance policy, the court may consider "the character of the business of the insured and the usual hazards involved therein in ascertaining the intent of the parties." Fulford v. Jenkins, 195 N.C. App. 402, 409, 672 S.E.2d 759, 763 (2009) (quotation omitted); see McDowell Motor Co., 233 N.C. at 253, 63 S.E.2d at 540. A court must construe an insurance contract as a reasonable person in the position of the insured would have understood the insurance contract. See Register v. White, 358 N.C. 691, 695, 599 S.E.2d 549, 553 (2004); Marriott Fin. Servs., Inc. v. Capitol Funds, Inc., 288 N.C. 122, 143, 217 S.E.2d 551, 565 (1975); Trophy Tracks, Inc., 195 N.C. App. at 738, 673 S.E.2d at 790.

Where a policy defines a term, that definition controls. See Gaston Cnty. Dyeing Mach. Co. v. Northfield Ins. Co., 351 N.C. 293, 299, 524 S.E.2d 558, 563 (2000); Woods v. Nationwide Mut. Ins. Co., 295 N.C. 500, 505–06, 246 S.E.2d 773, 777 (1978). Where a policy does not define a term, a court gives "nontechnical words . . . their meaning in ordinary speech, unless the context clearly indicates another meaning was intended." Woods, 295 N.C. at 506, 246 S.E.2d at 777; see Gaston Cnty. Dyeing Mach. Co., 351 N.C. at 299, 524 S.E.2d at 563; Brown v. Lumbermens Mut. Cas. Co., 326 N.C. 387, 392, 390 S.E.2d 150, 153 (1990); Grant v. Emmco Ins. Co., 295 N.C. 39, 42, 243

9

S.E.2d 894, 897 (1978). Moreover, courts give a term in an insurance policy the same meaning throughout the various coverages unless the policy clearly expresses an intent to give different meanings to the term within the different coverages in the same policy. See Grant, 295 N.C. at 54, 243 S.E.2d at 904; Fieldcrest Cannon, Inc. v. Fireman's Fund Ins. Co., 124 N.C. App. 232, 244, 477 S.E.2d 59, 67 (1996).

When more than one insurance policy affords coverage for a loss, "[t]he liability of each company must be determined by the terms of its own policy." Hlasnick v. Federated Mut. Ins. Co., 136 N.C. App. 320, 330, 524 S.E.2d 386, 393 (quotations omitted), aff'd in part and disc. review improvidently allowed in part, 353 N.C. 240, 539 S.E.2d 274 (2000); see Gaston Cnty. Dyeing Mach. Co., 351 N.C. at 305, 524 S.E.2d at 566; Allstate Ins. Co. v. Shelby Mut. Ins. Co., 269 N.C. 341, 346, 152 S.E.2d 436, 440 (1967). "The terms of another contract between different parties cannot affect the proper construction of the provisions of an insurance policy." Allstate Ins. Co., 269 N.C. at 346, 152 S.E.2d at 440; see Reliance Ins. Co. v. Lexington Ins. Co., 87 N.C. App. 428, 434, 361 S.E.2d 403, 407 (1987). Where more than one policy applies to the event at issue and each policy contains an "other insurance" clause, the court must examine the "other insurance" clauses in the competing policies "to determine which policy provides primary coverage and which policy provides excess coverage." Cinoman v. Univ. of N.C., 234 N.C. App. 481, 484–85, 764 S.E.2d 619, 622–23 (2014); see Hlasnick, 136 N.C. App. at 328–29, 524 S.E.2d at 391–92. Where the "other insurance" clauses in the policies are mutually repugnant, the claims will be pro rated between the separate policies according to their respective limits. See Hlasnick, 136 N.C. App. at 330, 524 S.E.2d at 393; N.C. Farm Bureau, Mut. Ins. Co. v. Bost, 126 N.C. App. 42, 52, 483 S.E.2d 452, 458–59 (1997). However, there is no need "to prorate coverage where . . . the 'other insurance' clauses are not mutually repugnant, but may be read together harmoniously." Hlasnick, 136 N.C. App. at 330, 524 S.E.2d at 393; see Iodice v. Jones, 133 N.C. App. 76, 79 & n.3, 514 S.E.2d 291, 293–94, 293 & n.3 (1999).

10

The court must decide whether the damages that CUMIS paid regarding LGFCU's commercial units were also covered under the Nationwide policy. If the Nationwide policy covers these damages, CUMIS argues that Nationwide is primarily responsible for coverage and must compensate CUMIS for the payments for which there is concurrent coverage.

### A.

Nationwide argues that the Business Personal Property and Data Processing Equipment damage paid for by CUMIS are not covered under the Nationwide policy and are explicitly excluded under the "property not covered" section of the policy. See [D.E. 40] 13–21. Nationwide also argues that nothing in the North Carolina's Condominium Act or the Declaration requires Nationwide to cover these claims. See [D.E. 55] 3–5. CUMIS responds that the Declaration requires the Nationwide policy to cover the LGFCU commercial units' fixtures, improvements, and alterations. See [D.E. 45] 12–22. CUMIS also argues that the CUMIS policy did not provide LGFCU with more specific insurance for the upfitted commercial units and that Nationwide's policy is primary and non-contributory. See id. 22–26.

The plain language of the Declaration does not require the Nationwide policy to cover LGFCU's Business Personal Property or Data Processing Equipment.[5] The Declaration only requires the Quorum Center to purchase insurance covering "the replacement cost of the Building and all contents thereof (except as expressly provided herein) at the time such insurance is purchased and at the time of each renewal thereof (excluding the cost of foundations and footings, and the cost of any personal property supplied or installed by Owners)." [D.E. 42-5] 24 (emphasis added). LGFCU supplied and installed the upfitting of their commercial units and provided the data processing equipment housed in LGFCU's commercial units. See NSMF ¶¶ 6–11; CR ¶¶ 6–11. Thus, the plain

---

[5] The parties discuss the Condominium Act and agree that the Act allows, but does not require, the Quorum Center to purchase insurance for fixtures installed by LGFCU. See [D.E. 45] 15; [D.E. 55] 11.

language of the Declaration excludes from mandatory coverage the Business Personal Property and Data Processing Equipment that LGFCU installed during the upfitting.

CUMIS argues that because LGFCU's upfitting and installation of the Data Processing Equipment involved routing cables through the floors and walls, then these items became fixtures and part of what the Declaration defines as the "building," and are covered under the Declaration. See [D.E. 45] 17–18; see also [D.E. 34, 52]. In support, CUMIS cites several cases defining when a tenant's installation of property becomes a "fixture." See, e.g., In re Laurel Hill Paper Co., 393 B.R. 372, 382–83 (Bankr. M.D.N.C. 2008); Wilson v. McLeod Oil Co., Inc., 327 N.C. 491, 514–15, 398 S.E.2d 586, 598–99 (1990). CUMIS also argues that because the Declaration refers to the Condominium Act, and the Condominium Act considers fixtures and improvements to be part of a "unit," then the Declaration must cover fixtures and improvements. See [D.E. 52] 6–7; N.C. Gen. Stat. § 47C-2-102(3).

The Business Personal Property and Data Processing Equipment supplied and installed by LGFCU did not become part of the "Building" as defined by the Declaration; therefore, the Quorum Center was not required to insure it under the Nationwide policy. The Declaration describes the term "Building" to include both the commercial units owned by LGFCU and other residential units. See [D.E. 42-5] 3, 7. The Declaration notes, however, that the definition of "Building" stems from the original plans of the Quorum Center's architect and land surveyor. See id. at 6, 7–8. Specifically, the Declaration states that "[t]he Building is more particularly described in the Plans, which show all particulars of the Building." Id. at 7. These original plans only include the "shell" units LGFCU originally purchased. The original building plans did not include the upfitting LGFCU began on their shell units starting in 2008. See NSMF ¶¶ 5–11; CR ¶¶ 5–11.

Reinforcing this reading of the Declaration, Article XII explains that the Quorum Center will be responsible for certain reconstruction and repair responsibilities in the event of damages to the Quorum Center Building. The Declaration limits this responsibility, however, stating that "[a]ny

12

reconstruction or repair shall be in accordance with the [original architectural] Plans." [D.E. 42-5] 27. Article XII, read in conjunction with the rest of the Declaration, clarifies that the term "Building" in the Declaration derives from the original architectural plans, not the characteristics of the individual units at the time of the 2017 fire. Thus, because the Business Personal Property and Data Processing Equipment are not reflected as part of the "Building" in the plans as required by the Declaration, they are not covered under the Nationwide policy.

Alternatively, even if the Declaration defines "building" solely in terms of the "unit" without reference to the original plans, CUMIS's argument fails. The Declaration includes as part of a "unit":

> As provided in N.C.G.S. § 47C-2-102(1) [(the Condominium Act)[6]], all lath, furring, wallboard, plasterboard, plaster, paneling, tiles, wallpaper, paint, finished flooring and any other materials constituting any part of the finished surfaces of the perimeter walls, floors, and ceilings are part of the Unit.

[D.E. 42-5] 8. Despite CUMIS's argument to the contrary, see [D.E. 52] 6 n.1, the Declaration specifically limits a "unit" to the "perimeter walls, floors, and ceilings." [D.E. 42-5] 8 (emphasis added). Because the Declaration contains the modifier "perimeter," which is absent in N.C. Gen. Stat. § 47C-2-102(1), the Declaration defines units by their perimeter walls, floors, and ceilings, and not by any internal subdivisions or improvements. Compare [D.E. 42-5] 8 with N.C. Gen. Stat. § 47C-2-102(1). The Business Personal Property and Data Processing Equipment supplied and installed by LGFCU is not part of any perimeter wall, floor, or ceiling. Thus, it does not constitute part of the "unit" as defined in the Declaration.

---

[6] N.C. Gen. Stat. § 47C-2-102(1) provides:

> If walls, floors or ceilings are designated as boundaries of a unit, then all lath, furring, wallboard, plasterboard, plaster, paneling, tiles, wallpaper, paint, finished flooring and any other materials constituting any part of the finished flooring, and any other materials constituting any part of the finished surfaces thereof are a part of the unit; and all other portions of such walls, floors, or ceilings are a part of the common elements.

13

CUMIS also argues that the court should consider N.C. Gen. Stat. § 47C-2-102(3) and its definition of fixtures in interpreting the term "Building" in the Declaration. Section 47C-2-102(3), however, is not cited or relied upon in the Declaration for defining "unit" or "Building." Indeed, the Declaration does not cite N.C. Gen. Stat. § 47C-2-102(3) anywhere in the document.[7] Thus, the court declines to write N.C. Gen. Stat. § 47C-2-102(3) into the Declaration.

The term "Building" and "unit" do not encompass LGFCU's Business Personal Property and Data Processing Equipment, and the Declaration explicitly excludes these items from the insurance obligations as "the cost of any personal property supplied or installed by Owners." [D.E. 42-5] 24.[8] The explicit reference to items "supplied or installed by Owners" reinforces this conclusion. Id. Therefore, the Declaration does not require Nationwide to cover the Business Personal Property and Data Processing Equipment damages that CUMIS paid.

Having determined that the Declaration does not mandate coverage for LGFCU's Business Personal Property and Data Processing Equipment, the court next considers the text of the Nationwide policy. Nationwide argues that because the Declaration does not mandate coverage, LGFCU's Business Personal Property and Data Processing Equipment is specifically excluded under the plain text of the Nationwide policy. See [D.E. 55] 3, 5–8. CUMIS responds that the "Unit-Owner's Insurance" provision in the Nationwide policy means that the Nationwide policy functions as the primary insurance even if an owner separately insured its property. See [D.E. 45] 25.

_____

[7] Tellingly, the Declaration explicitly cites subsections 1, 2, and 4 of N.C. Gen. Stat. § 47C-2-102, but not subsection 3. See [D.E. 42-5] 5, 8.

[8] This explicit language in the Declaration defeats CUMIS's citation to North Carolina cases regarding ownership of fixtures. The Declaration does not explicitly incorporate the common law of fixtures into its definition, and this case is not a landlord-tenant dispute about ownership and removability of fixtures. See, e.g., In re Laurel Hill Paper Co., 393 B.R. at 382. Blindly adopting the common law definition of fixtures also would override the Declaration's exclusion of footings from coverage, even though footings are traditionally considered fixtures attached to real property. See Little by Davis v. Nat'l Servs. Indus., Inc., 79 N.C. App. 688, 694–96, 340 S.E.2d 510, 514–15 (1986).

14

The plain language of the Nationwide policy does not include coverage for LGFCU's Business Personal Property and Data Processing Equipment. Under "covered property," the Nationwide policy covers "fixtures, improvements and alterations" only if "your Condominium Association Agreement requires you to insure it." [D.E. 42-1] 22, 106. The Declaration did not require the Nationwide policy to cover LGFCU's Business Personal Property and Data Processing Equipment; therefore, these items are not covered under the Nationwide policy. The Nationwide policy's "property not covered" language reinforces this conclusion. The Nationwide policy excludes "[p]roperty that is covered under another coverage form of this or any other policy issued to the Named Insured listed on this policy in which it is more specifically described, except for the excess of the amount due (whether you can collect it or not) from that other insurance." Id. at 23.[9] The CUMIS policy specifically covered LGFCU's "interest as a condominium unit owner in fixtures improvements, and alterations making up part of the building and owned by the insured as a condominium unit owner," including improvements made to service LGFCU's data processing equipment and operations. [D.E. 42-2] 77, 103.

CUMIS recognizes that the CUMIS policy describes the data processing equipment in more detail than the Nationwide policy does, but CUMIS argues that the CUMIS policy is no more specific than the Nationwide policy regarding the other fixtures and upfits to the LGFCU properties. See [D.E. 45] 23. Unlike the CUMIS policy, however, the Nationwide policy's coverage of fixtures depends on whether coverage is required under the Declaration. CUMIS's argument that the Nationwide Policy is not truly "contingent" rests on the faulty premise that the Declaration requires Nationwide to cover these fixtures. Because the Declaration does not require the Nationwide policy to cover the fixtures at issue, CUMIS's argument fails.

_____

[9] CUMIS notes that both the Declaration and the Condominium Act envision a condominium owner having multiple, overlapping coverages. See [D.E. 45] 24. True enough, but the plain language of the Nationwide policy still must cover a specific loss.

Next, CUMIS argues that the "property not covered" provision of the Nationwide policy is simply an excess clause. See [D.E. 52] 8. In support, CUMIS cites Monumental Paving & Excavating, Inc. v. Penn. Manufacturers' Ass'n Insurance Co., 176 F.3d 794, 799–800 (4th Cir. 1999). However, in Monumental Paving & Excavating, the court did not analyze a policy like the one in this case, where the policy specifically and unambiguously does not include Business Personal Property and Data Processing Equipment under the "covered property provision" because the Declaration does not require the insurance company to insure these assets. Therefore, the Monumental Paving & Excavating court's analysis of excess clauses does not help CUMIS. Moreover, the "property not covered" section of the Nationwide policy is not the only evidence that LGFCU's Business Personal Property and Data Processing Equipment is not covered under the Nationwide policy. Instead, the "property not covered" provision compliments the court's interpretation of the "covered property" provision.

CUMIS also argues that the "Unit-Owner's Insurance" provision somehow overrides the Nationwide policy's other sections. The "Unit-Owner's Insurance" provision states that a "unit-owner may have other insurance covering the same property as this insurance. [The Nationwide policy] is intended to be primary, and not to contribute with such other insurance." [D.E. 42-1] 107. Nothing in this provision, however, functions to expand the definitions of what is covered and what is not covered under the Nationwide policy. Instead, this provision only applies if the Nationwide policy actually covers the same property as other insurance. Unlike in the cases CUMIS cites, no conflict exists between the "Unit-Owner's Insurance" provision and the grant of coverage in the Nationwide policy. See Anderson v. Cincinnati Ins. Co., No. CA 1:12-156, 2013 WL 445998, at *5 (W.D.N.C. Feb. 5, 2013) (unpublished); Carlson v. Old Republic Ins. Co., 160 N.C. App. 399, 402, 585 S.E.2d 497, 499 (2003).

CUMIS also discusses how Nationwide inspected the Quorum Center and argues that Nationwide "contemplated" insuring all units in the building, regardless if they were "shell" units;

16

therefore, Nationwide did not differentiate "whether any of the office space was not completely built out at the time of Nationwide's inspections." [D.E. 34] 27. Cumis also discusses how it believes LGFCU understood Nationwide's obligations under the Nationwide policy. See id.

How Nationwide inspected the Quorum Center and that Nationwide did not specifically mention that the LGFCU's units were once "shells" does not affect whether the Nationwide policy covered LGFCU's upfits. Moreover, even if LGFCU believed Nationwide provided coverage based on LGFCU's reading of the Declaration, this alleged belief does not change the analysis. LGFCU's unilateral misreading or misunderstanding of the scope of Nationwide's coverage does not entitle CUMIS to recover money that the text of Nationwide's policy explicitly excludes. In light of the language in the Declaration and the Nationwide policy, Nationwide is not required to compensate CUMIS for its payments concerning LGFCU's Business Personal Property and Data Processing Equipment.

## B.

Nationwide does not contest that the Nationwide policy has provisions which could provide primary and non-contributory coverage to LGFCU's claims for extra expense, data processing extra expense, and rental income. See [D.E. 40] 21–26. Instead, Nationwide argues that because neither LGFCU nor CUMIS promptly communicated claims for these expenses to Nationwide, Nationwide properly denied coverage under the notice requirement provision of the Nationwide policy. See id. at 22. According to Nationwide, due to late notice of these claims, "Nationwide did not have the opportunity to investigate and either accept or deny LGFCU's claim for extra expense and business income coverage." Id. at 23. CUMIS responds that any delay on the part of LGFCU and CUMIS was in good faith and that Nationwide was on notice of these losses from Nationwide's investigation of the fire but failed to investigate these claims. See [D.E. 45] 27–35.

The Nationwide policy has a notice provision described under the heading "Duties in the Event of Loss Or Damage." See [D.E. 42-1] 48. This provision requires that, "in the event of loss

17

of or damage to Covered Property," the insured must "Give [Nationwide] prompt notice of the loss or damage[,] [i]nclud[ing] a description of the property involved" and "[a]s soon as possible, give us a description of how, when and where the loss or damage occurred." Id. Failure to comply with an insurance policy's notice provision can bar coverage under the policy. See Great Am. Ins. Co. v. C. G. Tate Constr. Co., 303 N.C. 387, 399, 279 S.E.2d 769, 776 (1981) ("Great American I"); see also Metric/Kvaerner Fayetteville v. Fed. Ins. Co., 403 F.3d 188, 197-98 (4th Cir. 2005). To analyze the effect of such a notice provision, North Carolina courts apply a three-part test:

> [T]he trier of fact must first decide whether the notice was given as soon as practicable. If not, the trier of fact must decide whether the insured has shown that he acted in good faith, e.g., that he had no actual knowledge that a claim might be filed against him. If the good faith test is met the burden then shifts to the insurer to show that its ability to investigate and defend was materially prejudiced by the delay.

Great American I, 303 N.C. at 399, 279 S.E.2d at 776; see Metric/Kvaerner Fayetteville, 403 F.3d at 197–98; Great Am. Ins. Co. v. C. G. Tate Constr. Co., 315 N.C. 714, 719–20, 340 S.E.2d 743, 746–47 (1986) ("Great American II"); Pulte Home Corp. v. Am. S. Ins. Co., 185 N.C. App. 162, 172, 647 S.E.2d 614, 621 (2007); Liberty Mut. Ins. Co. v. Pennington, 141 N.C. App. 495, 500, 541 S.E.2d 503, 507 (2000). Whether an insured acted in good faith is a subjective, two-part inquiry: (1) whether the insured was aware of its possible fault and (2) whether the insured purposefully and knowingly failed to notify the insurer. See Great American II, 315 N.C. at 720, 340 S.E.2d at 747.

In Metric/Kvaerner Fayetteville v. Federal Insurance Co., 403 F.3d 188 (4th Cir. 2005), the Fourth Circuit applied the Great American test to an insurance policy which required the insured to give "notice of loss as soon as possible" along with a description of the property involved and the loss which occurred. See id. at 191. The Fourth Circuit held that an insured could meet the notice requirement under Great American by showing constructive notice, and that an insurer could become aware of loss even without direct notice or a formal claim from the insured. See id. at 199–200; Great American II, 315 N.C. at 718 n.1, 340 S.E.2d at 746 n.1. In Metric/Kvaerner, the Fourth Circuit held that the insurer had constructive notice of an insured's claims because the insurer "was

18

aware of the damages and extensive repairs at the Facilities as they occurred, and well before the Claim was filed" as evidenced by the insurer's adjuster making multiple visits to the facility before the insured filed a claim. Id. at 200. The Fourth Circuit concluded that the insurer "knew or should have known that the losses and damages suffered at the Facilities might be covered by the Policies and that M/K, as an insured, would be likely to submit a claim for Covered Losses." Id.

Viewing the record in the light most favorable to CUMIS and applying Metric/Kvaerner to this case, Nationwide had actual knowledge of the March 2017 fire, was made aware that LGFCU suffered losses and planned to make claims for some of these losses, and had four adjusters on site to inspect the damage caused by a fire less than a week after the March 2017 fire. See CA ¶ 60; [D.E. 42-11]; [D.E. 42-12]. These factors create a genuine issue of material fact regarding whether Nationwide had constructive notice of claims for extra expense, data processing extra expense, and rental income. Indeed, if Nationwide's adjusters assessed that the damage from the fire was extensive and would require extensive repairs, then it was foreseeable that LGFCU would have claims under, for example, the Nationwide policy for rental income if the fire damage rendered LGFCU's commercial units unusable.[10] Thus, although CUMIS failed to file a formal claim for extra expense, data processing extra expense, and rental income, genuine issues of material fact exist concerning whether Nationwide had constructive notice under Metric/Kvaerner.

A genuine issue of material fact also exists concerning whether CUMIS's delay was in good faith. An insured's delay in communicating a formal claim to the insurer is not enough to establish that an insured failed to act in good faith, especially if the insured had constructive notice of the claims. See Metric/Kvaerner Fayetteville, 403 F.3d at 202. Nationwide argues that "CUMIS

_____

[10] There also is a genuine issue of material fact concerning whether Nationwide's constructive notice extended to all aspects of extra expense, data processing extra expense, and rental income. Although some potential claims, such as rental income, could easily be discerned from inspection of the Quorum Center, it is unclear to what extent Nationwide's adjusters could have been on constructive notice for potential data processing expenses or other claims under the extra expense coverage.

presented no reasonable excuse for not timely submitting these claims other than it simply did not do so." [D.E. 55] 9. CUMIS responds that because "LGFCU notified Nationwide of the fire loss immediately and met four Nationwide adjusters on-site less than a week after the fire," Nationwide received notice of the potential claims stemming from the March 2017 fire. [D.E. 45] 32. Moreover, CUMIS's reasons for waiting until August 2020 to formally file claims for extra expense, data processing extra expense, and rental income coverage are not facially implausible and do not suggest, without other evidence, that CUMIS did not act in good faith.[11]

In opposition, Nationwide cites Digh v. Nationwide Mutual Fire Insurance Company, 187 N.C. App. 725, 731, 654 S.E.2d 37, 41 (2007). However, Digh is only relevant if the court concluded that Nationwide had no notice of the potential claims. Here, Nationwide arguably had constructive notice of the potential claims. Moreover, in Digh, the court relied on evidence that Digh delayed submitting his claim in order to keep his insurance premiums low in finding that Digh failed to act in good faith. See id. at 731, 654 S.E.2d at 41. Nationwide cites no similar evidence in this case. Therefore, Digh does not help Nationwide.

As for material prejudice, Nationwide does not argue that, even if it had constructive notice of LGFCU's claims, it was materially prejudiced by any delay. See [D.E. 40, 55]. Under North Carolina law, relevant factors to consider in deciding the issue of material prejudice include (1) the availability of witnesses to the pertinent events; (2) the ability to discover other information regarding the conditions of the locale where the events occurred; (3) any physical changes in the location of the events during the period of the delay; (4) the existence of official reports concerning the events; (5) the preparation and preservation of demonstrative and illustrative evidence (such as photographs); and (6) the ability of experts to reconstruct the events. Great American I, 303 N.C.

---

[11] CUMIS argues that it delayed filing a formal claim because it wanted to consult with counsel and that calculating exact loss payments "required a complex and detailed reconciliation of losses incurred by LGFCU, coverage with and payments made by CUMIS for those losses, and losses incurred by LGFCU that exceeded the CUMIS policy coverage." [D.E. 45] 30.

20

at 398, 279 S.E.2d at 776. "Proof of the existence of any of the above factors is not determinative; the insurer must also show that the changed circumstance materially impairs its ability to investigate the claim or defend and, thus, to prepare a viable defense." Id. at 398–99, 279 S.E.2d at 776.

Genuine issues of material fact exist regarding Nationwide's ability to investigate and ascertain what portions of these expenses were covered. Especially because CUMIS failed to provide Nationwide with formal notice of what specific losses it was claiming and what specific property CUMIS claimed under the extra expense, data processing extra expense, and rental income coverage,[12] a genuine issue of material fact exists concerning whether CUMIS's failure to promptly file a claim materially prejudiced Nationwide's ability to adequately investigate and process the late claims.

Because genuine issues of material fact exist concerning the extra expense, data processing extra expense, and rental income coverage claims, summary judgment is not appropriate for either party. Thus, the court denies both CUMIS's and Nationwide's motion for summary judgment on payment for extra expense, data processing extra expense, and rental income coverage.

## C.

Nationwide argues that the $91,850 LGFCU paid to Pro Con, a construction consulting firm, for project management services concerning LGFCU's post-fire reconstruction efforts is not covered under the Nationwide policy. See [D.E. 40] 21; [D.E. 55] 10–11. Although LGFCU originally claimed this expense to CUMIS under the "extra expense" coverage, CUMIS seeks reimbursement under the Nationwide policy's "building coverage" policy, specifically under the section describing "property loss conditions." See [D.E. 40] 21 n.12; [D.E. 45] 33–35. CUMIS argues that because

---

[12] The parties agree that LGFCU and CUMIS delayed in providing Nationwide with formal notice or any details of LGFCU's claims for extra expense, data processing extra expense, and rental income. See [D.E. 40] 24; [D.E. 45] 27 ("[I]t is undisputed that the specific extra expense and business income claims were not presented to Nationwide before August 24, 2020.").

21

the Nationwide policy covers services that are "necessary" to repair or replace lost property, the project management services are covered. See [D.E. 45] 33–35; [D.E. 52] 10–11.

Nationwide's building coverage only covers "direct physical loss of or damage to Covered Property at the described premises in the Declarations caused by or resulting from any Covered Cause of Loss." [D.E. 42-1] 22. The parties' briefs do not cite specific evidence detailing what Pro Con actually did under this "project management" contract. Rather, CUMIS argues that Pro Con served to "manage a complex and extensive rebuild project at a high-rise, mixed-use condominium building such as the Quorum Center to insure compliance with plans, specifications and building and fire codes." [D.E. 45] 35; CR ¶ 80.

CUMIS representative David Spielbauer stated that LGFCU retained Pro Con " as basically an owner's representative during the remodeling, reconstruction of the building." [D.E. 42-18] 22. Additionally, the Pro Con invoices CUMIS attached to its motion for summary judgment state that Pro Con billed for services as "Owner Representative" in LGFCU's reconstruction endeavors. See, e.g., [D.E. 37-20–37-25].

The fees LGFCU paid to Pro Con do not constitute a physical loss and are not covered under the "building coverage" section of the Nationwide policy. Assuming without deciding that the phrase "direct physical loss of or damage to Covered Property at the described premises in the Declaration caused by or resulting from any Covered Cause of Loss" in the Nationwide policy would include reasonable architect or engineering fees, the evidence does not show that Pro Con provided such services. No record evidence suggests that Pro Con prepared architectural plans required for the reconstruction or did anything other than serving as LGFCU's representative overseeing reconstruction. Thus, the cases CUMIS cites describing critical architectural planning and engineering services do not apply to Pro Con's services. See [D.E. 45] 34; cf. Greenlake Condo. Assoc. v. Allstate Ins. Co., No. C14-1860, 2016 WL 4499330, at *1 n.1 (W.D. Wash. Feb. 3, 2016) (unpublished); Whalen v. State Farm Fire & Cas. Co., 183 F. Supp. 3d 672, 680 (E.D. Pa. 2016).

22

Rather, Pro Con's services are more akin to the claim processing fees or other administrative costs discussed in Capitol Property Management Corp. v. Nationwide Property & Casualty Insurance Co., 757 Fed. App'x 229, 233–34 (4th Cir. 2018) (unpublished). Cf. [D.E. 55] 10. However, as in Capitol Property Management Corp., the fees paid to Pro Con are not direct physical losses. Thus, they are not covered under the "building coverage" of the Nationwide policy. Moreover, even under the definition of "necessary" proposed by CUMIS, fees paid to Pro Con to serve as LGFCU's agent to oversee reconstruction do not constitute something "indispensable" to reconstructing and repairing LGFCU's physical losses. N.C. Farm Bureau Mut. Ins. Co. v. Weaver, 134 N.C. App. 359, 362, 517 S.E.2d 381, 383 (1999) (quotation omitted).

LGFCU's decision to hire Pro Con may have been a prudent business decision. Nevertheless, this expense is not covered under the Nationwide policy for "building coverage." Thus, the court grants Nationwide's motion for summary judgment on the issue of coverage for fees paid to Pro Con.

III.

In sum, the court DENIES plaintiff's motion for partial summary judgment [D.E. 33] and GRANTS IN PART and DENIES IN PART defendant's motion for summary judgment [D.E. 39]. Defendant need not cover plaintiff's insurance payments concerning LGFCU's Business Personal Property and Data Processing Equipment or fees paid to Pro Con. However, genuine issues of material fact exist concerning whether defendant had constructive notice of the claims for extra expense, data processing extra expense, and rental income, whether plaintiff's delay in providing notice was in good faith, and material prejudice. The parties shall engage in a court-hosted settlement conference with Magistrate Judge Numbers.

SO ORDERED. This _11_ day of August, 2023.

James C. Dever

JAMES C. DEVER III
United States District Judge

Case 5:21-cv-00044-D   Document 59   Filed 08/11/23   Page 23 of 23